AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>The Contents of Chase Bank Account 0798217581<br>belonging to Karen Alexya Portillo | )<br>)<br>)  Case No.   23-MR-2000<br>)<br>) |

**FILED**
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____ District of New Mexico is subject to forfeiture to the United States of America under   18   U.S.C. § 981, 982   *(describe the property)*:

The Contents of Chase Bank Account 0798217581 belonging to Karen Alexya Portillo

The application is based on these facts:
See attached affidavit, prepared by SA Kevin Rinehart. This affidavit was reviewed and approved by AUSA Letitia Simms on October 17, 2023.

☑ Continued on the attached sheet.

*Applicant's signature*

Kevin Rinehart, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by being telephonically sworn and electronically signed.

Date:  October 17, 2023

*Judge's signature*

City and state:  Albuquerque, New Mexico                    Karen B. Molzen, U.S. Magistrate Judge
                                                             *Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF:<br>**The Contents of Chase Bank Account 0798217581 belonging to Karen Alexya Portillo** | Case No. ____23-MR-2000____ |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEIZURE WARRANT

I, Kevin Rinehart, being first duly sworn, hereby depose and state as follows:

## AGENT BACKGROUND

1. I am employed a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations (HSI), Albuquerque, New Mexico and have been employed in this position since September 2018. I am an investigative law enforcement officer of the United States, and I am empowered by law to conduct investigations and make arrests for felony offenses. I successfully completed twelve weeks of Criminal Investigator Training Program, and the Homeland Security Investigations Special Agent Training at the Federal Law Enforcement Training Center in Brunswick, Georgia. I am also a graduate of the South Carolina Criminal Justice Academy Basic Law Enforcement Training Program (BLE 549) and have served as a certified law enforcement officer in various capacities since 2009. I hold a bachelor's degree *cum laude* in History from Marietta College.

2. I am authorized to investigate violations of Titles 8, 18, and 19 of the United States Code and am designated as an immigration officer under Title 8 and a customs officer under Title

19 with full authorities to investigate and enforce the immigration and customs laws and regulations of the United States.

3. I have been involved in an ongoing investigation into a human smuggling and money laundering organization operating throughout the United States involving the co-conspirators: Jose Davila Castillo in Aurora, CO, Joaquin Davila Castillo in Aurora, CO, Cecilia Guzman Rios in Aurora, CO, and Karen Portillo in Odessa, TX (amongst others) that were responsible for and instrumental in human smuggling activities occurring within the District of New Mexico.

4. I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as the knowledge of fellow law enforcement agents and officers who have participated in the investigation.

## PROPERTY FOR SEIZURE

5. I make this affidavit in support of an Application and Warrant to Seize pursuant to Rule 41 of the Federal Rules of Criminal Procedure, Title 18 United States Code Sections 981 and 982, and Title 21 United States Code Section 853, for:

**All Funds in the following account (referred to as SUBJECT PROPERTY):**

1. **Chase Bank account number 0798217581 (with account holder Karen Alexya Portillo) and/or any associated General Ledger or Suspense account**

## AUTHORITY TO SEIZE

6. The statements made in this affidavit are based upon information I gained from the investigation, personal observations, training and experience, as well as from information relayed to me by other individuals, including law enforcement officers. Since this affidavit is

being submitted for the limited purpose of securing a seizure warrant, I have not included each and every fact known to me concerning this investigation.

7. Your affiant asserts that, based upon the facts detailed in this affidavit, probable cause exists to believe the aforementioned property listed in paragraph 5 is evidence of and constitutes proceeds, i.e., fruits, of violations of Title 8 U.S.C. 1324, Bringing in and Harboring Certain Aliens, 1956(a)(1)(B)(i), Laundering of Monetary Instruments, and 1956(a)(2), International Money Laundering. *See* Fed. R, Crim. P. 41 (c)(1)-(2). Additionally, the property listed in paragraph 5 is subject to civil forfeiture pursuant to Title 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C) because it constitutes or was derived from proceeds traceable to violations of Title 8 U.S.C. § 1324. The property is also subject to criminal forfeiture under Title 18 U.S.C. §§ 982(a)(1) and 982(a)(6)(A) because it is, or is traceable to, property involved in a violation of Title 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(a)(2) and is, or is derived from, gross proceeds of a violation of Title 8 U.S.C. § 1324 (i.e., Section 274(a) of the Immigration and Nationality Act). *See also* 8 U.S.C. § 1324(b)(1).

8. Civil forfeiture authority for the abovementioned violations exists under the following statutes:

   a. Title 18 U.S.C. § 981(a)(1), which provides: "The following property is subject to forfeiture to the United States: (A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section **1956**, 1957 or 1960 of this title, or any property traceable to such property." (emphasis added).

   b. Title 18 U.S.C. § 981(a)(1)(C), which provides: "Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471. 472, 473, 474, 476, 477, 478, 479, 480 . . . or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this

title), or a conspiracy to commit such offense."[1]

9. The seizure of property that is subject to civil forfeiture is authorized by Title 18 U.S.C. § 981(b).

10. Title 18 U.S.C. § 982 provides for criminal forfeiture of certain property upon conviction for violations of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(a)(2), and 8 U.S.C. § 1324 (i.e., Section 274(a) of the Immigration and Nationality Act). Regarding sections 1956 and 1960, "the court, in imposing sentence on a person convicted of an offense in violation of section **1956**, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property" 18 U.S.C. § 982(a)(1) (emphasis added).

11. Title 18 U.S.C. § 982(a)(6)(A) states "[t]he Court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate, section 274(a) . . . of the Immigration and Nationality Act . . . shall order that the person forfeit to the United States, regardless of any provision of State law—(i) any conveyance, including any vessel, vehicle, or aircraft used in the commission of the offense of which the person is convicted; and (ii) any property, real or personal—(I) that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted; or (II) that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of which the person is convicted." Section 274(a) of the Immigration and Nationality Act is codified under 8 U.S.C. § 1324(a).

12. Title 8 U.S.C. § 1324(b)(1) states "any conveyance, including any vessel, vehicle, or aircraft, that has been or is being used in the commission of a violation of subsection (a), the gross

---

[1] 18 U.S.C. § 1956 (c)(7)(A) includes as a "specified unlawful activity" "any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31." Section 1961(1)(F) specifically lists 8 U.S.C. 1324 as a specified unlawful activity.

proceeds of such violation, and any property traceable to such conveyance or proceeds, shall be seized and subject to forfeiture."

13. The seizure of property that is subject to criminal forfeiture is authorized by Title 18 U.S.C. § 982(b)(1), which provides that "the forfeiture of property under this section, including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853)" 18 U.S.C. § 982(b)(1). Title 21 U.S.C. § 853(f) provides for the issuance of seizure warrants authorizing the seizure of property subject to criminal forfeiture.

## RELEVANT CRIMINAL STATUTES

14. Title 8 U.S.C. § 1324(a)(1)(A)(i)-(iii), (v), Bringing in or Harboring Certain Aliens provides, in relevant part, the following:

> Any person who—(i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;
> (ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of the law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law; (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation . . . (v)(I) engages in any conspiracy to commit any of the preceding acts, or (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).

15. Title 18 U.S.C. § 1956(a)(1)(B)(i), Laundering of Monetary Instruments provides, in relevant part, the following:

> Whoever, knowing that the property involved in a financial transaction represents

the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . (B)(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

16. Title 18 U.S.C. § 1956(a)(2), referred to as the "International Money Laundering" provision of 18 U.S.C. § 1956, provides, in relevant part, the following:

Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United State or to a place in the United States from or through a place outside the United States—(A) with the intent to promote the carrying on of specified unlawful activity; or (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both.

## PROBABLE CAUSE

17. On November 2nd, 2022, at approximately 2312 hours Special Agent Sean Murphy of Homeland Security Investigations in Albuquerque received a phone call from the Phoenix Police Department in Phoenix, AZ. Sgt. Darren Arnson advised that a female subject identified as Witness 1 (hereinafter W1) reported to the Phoenix Police Department that her sister, identified as Victim 1 (hereinafter V1) was being held by a human smuggler in Albuquerque, NM. W1 further advised that her sister's two minor daughters, identified as Minor Victim 1 (hereinafter MV1) and Minor Victim 2 (hereinafter MV2), were also being held by the smuggler. At the time of the report MV1 was a 9-year-old female and MV2 was a 5-year-old female. W1 advised that the Suspect stated that she could bring $6,000 to Albuquerque, NM to

secure the release of her family members. She further stated that she had already paid more than $30,000 to have her sister and nieces smuggled into the United States.

18.     On November 3, 2022, Special Agents from Homeland Security Investigations along with Detectives from the Albuquerque Police Department VICE Unit continued investigating this matter. Direct phone contact was made with W1 who confirmed the information relayed by the Phoenix Police Department. She provided a video depicting V1, MV1, and MV2. Additionally, she advised the video was sent to her from the suspect as proof that the suspect had her family members.[2] She further provided a recording of a phone call which confirmed her report. On the recording a female subject spoke with W1. After some conversation, the female subject passed the phone to an unknown male. W1 advised that the female subject with whom she spoke on the recording was her sister. Spanish speaking law enforcement officers were able to deduce that the information on the recording corroborated the statement from W1 about V1, MV1, and MV2 not being released from the suspect's custody until they receive payment. W1 further detailed that V1's phone was taken from her and turned off.

19.     W1 stated that she had previously paid for V1 and the minor victims to be smuggled into the United States. She stated that she learned of the additional payment demand from the suspect when the suspect called her on November 2, 2022. She advised that the suspect phone number is 505-435-8225. The phone carrier was identified as AT&T. An exigent request for location data was made to AT&T. The location data received from AT&T consistently correlated to an area of the 300 Block of Valencia St SE. Detectives with the Albuquerque Police

---

[2] This is commonly referred to as a Proof of Life video and in my training and experience is a tactic employed by human smugglers and hostage takers to prove the viability of the victims in their possession and to entice the paying party to participate in the ransom demands.

Department canvassed the area which has hundreds of individual residences. Detectives exhausted all abilities to pinpoint the specific location of the alleged suspect's phone at that time. Subscriber data for the aforementioned number returned to a subject named Eloisa VASQUEZ.

20.     Further investigation revealed a second number with the same subscriber, Eloisa VASQUEZ. That number, 505-520-8090, was linked to a money transfer to Mexico in October 2022 by Eloisa VASQUEZ. At that time, VASQUEZ utilized an address of 541 Palomas Drive in Albuquerque, NM. An exigent request for location data on that phone was made to the service provider, AT&T. Location data received consistently correlated to the area of 541 Palomas Drive with radius between approximately 8 and 30 meters. As a result, continuous surveillance was established on that residence.

21.     An Undercover Agent (UCA), through coordination with W1, was able to establish contact with a male subject on the suspect phone with the number 505-435-8225. Several phone calls were exchanged. One of the calls was answered by a female subject who advised that the male had fallen asleep. Ultimately, the male subject re-established contact with the UCA via telephone and arranged to meet. The agreement was for the UCA to pay $6,000 in cash to the suspect in exchange for V1, MV1, and MV2. Shortly after the arrangements were made, surveillance units indicated that the observed an adult female and two female children exit an apartment of 541 Palomas Drive Apartment A and enter a Dodge van. Surveillance units then saw multiple other individuals exit the same residence and get into a Honda SUV. Shortly thereafter, the two vehicles departed the parking area of the residence. The Honda SUV ultimately took an eastern route. The Dodge van took a western route in the

direction of the meet location. Surveillance was maintained on the Dodge van continuously from the residence to the meet location.

22. On November 3, 2022, at approximately 2315 hours the UCA made contact with the driver of the van at the pre-established meet location. The UCA paid $6,000 in cash, and the driver of the van, ultimately identified as Marcelo ALONSO-ALMARAZ allowed the UCA to take possession of V1, MV1, and MV2 who were in the van. Upon taking possession of the victims, agents from the HSI El Paso Special Response Team moved in and took the remaining occupants into custody. The front seat passenger of the van was identified as Eloisa ALMARAZ-VASQUEZ. Additionally, there were two remaining occupants in the rear of the vehicle. Ultimately, the remaining occupants were discovered to be in the United States illegally and were to be transported to a different destination following the release of V1, MV1, and MV2.

23. A search incident to arrest of the Dodge van yielded a Smith and Wesson pistol on the driver side floorboard of the vehicle. While rendering the firearm into a safe condition, Agents observed that the magazine to the firearm was loaded with ammunition, but a round had not been placed into the chamber. Based on the training, knowledge, and experience of Agents on the scene the firearm appeared to be functional. An additional magazine for a Smith and Wesson firearm was located in a purse on the passenger side floor. This magazine was not loaded at the time. A .380 caliber round was located on ALONSO-ALMARAZ's person. The $6,000 paid by the UCA to ALONSO-ALMARAZ was also recovered. Approximately $1,300 in cash, apart from the UCA payment, was also recovered. Three electronic devices were also located inside the van and were seized.

24. The victims were immediately removed from the scene and taken to Homeland Security Investigations in Albuquerque, NM. At that location, an interview was conducted with V1. Among other things, during the interview the following information was gathered. V1 stated that she arrived in Albuquerque on Sunday October 30, 2022, and has not stayed anywhere other than 541 Palomas Drive Apartment A in Albuquerque, NM. V1 advised that the male subject driving the van, identified as Marcelo ALONSO-ALMARAZ, was the main controller of the people in the residence. V1 further stated that Eloisa ALMARAZ-VASQUEZ, the front seat passenger of the van, made the proof of life video of V1 and her daughters and that ALMARAZ-VASQUEZ was helping to coordinate the collection of extortion funds. V1 affirmed that she and her daughters were not the only people in the residence who were in the process of being smuggled. V1 advised that there were routinely large groups of aliens in the apartment. V1 advised that when she left the evening of her rescue, there were numerous other illegal aliens in the residence, to include a young child. She stated that during her time there, the aliens were never left without someone watching them. She further stated that other aliens at the location were also being extorted for money in the same manner as she was. V1 described volatile conditions in the apartment, including overcrowding, lack of food, physical assaults, and threats of harm.

25. ALONSO-ALMARAZ and ALMARAZ-VASQUEZ were transported back to Homeland Security Investigations for processing. A check of ALONSO-ALMARAZ's fingerprints indicated that he had previously been deported and that he is a Mexican national. Database checks indicated that ALMARAZ-VASQUEZ had no legal status in the United States.

26.     On November 4, 2022, agents from Homeland Security Investigations responded to 541 Palomas Drive Apartment A in Albuquerque, New Mexico out of concern for the health and wellbeing of remaining aliens which V1 spoke about.  Given the statements made by V1 concerning the lack of food, presence of small children, and hostility of the hostage takers, as well as the information and observations made about 541 Palomas Drive, Agents made entry into the premises to locate and remove potential hostages who agents believed were in danger. Upon entry, approximately 50 illegal aliens were located, to include one young child. Initial observations by agents corroborated the concern for their safety.  A subsequent Search and Seizure Warrant was issued for the premises.  During the court authorized search, among other things, Agents located numerous cellular devices and approximately $36,800 in U.S. currency.  Agents recognized the removal of cellular devices from smuggled persons as a common method to isolate them from their family, friends, and associates for the Human Smuggling Organizations to extort them for additional payment.

27.     A follow up interview was conducted with W1 which yielded further information. W1 identified herself as the half-sister of V1 and stated they shared the same mother. W1 told Agents she was given the contact phone number for Jose Guadalupe DAVILA CASTILLO (hereinafter referred to as Jose DAVILA) by V1 and stated she was told that Jose DAVILA would arrange to have V1 and her children smuggled into the United States. SAs asked W1 if she considered Jose DAVILA to be the primary point of contact and the coordinator for V1's smuggling event, and W1 advised that is what she believed at the time.

28.     W1 provided SAs with a photograph that depicted the total amount of money she had to pay to have V1, MV1, and MV2 smuggled into the United States. SA McCluskey viewed the photograph and noted the total amount paid by W1 was $42,620. The amount was divided

into several smaller payments that W1 stated she had to deposit into various bank accounts provided to her via text message by Jose DAVILA and a female she identified as Guadalupe (later identified by SA Rinehart as Guadalupe Davila-RAMIREZ) who operated as a secretary for Jose DAVILA. W1 further stated she spent the night at Guadalupe's house in Phoenix, Arizona while she waited for V1 to arrive. W1 advised she believed V1 and her kids were going to be taken to Phoenix by the smuggling organization, however; W1 stated she became concerned for their safety once they reached El Paso, Texas because she lost contact with V1.

29. W1 stated she spoke with Jose DAVILA several times over the phone, and he assured her that V1 and her children would arrive safely because she paid all the money that was required. As the days progressed, W1 said she stopped hearing from V1 entirely and was told V1 had her phone removed from her possession. W1 told SAs when she was finally able to speak with V1 on her phone, she was directed to speak to a male who sounded very angry and agitated (SAs believe the male W1 was referring to is Marcelo ALONSO-ALMARAZ). W1 said the male started making excessive demands for more money and threatened to have the children sent back to Mexico where they would be killed. W1 said she was able to briefly speak with V1, and V1 told her to just pay the money. W1 described V1 as sounding completely distressed.

30. W1 told SAs she was fearful at the time that V1 and her kids were going to be killed if she did not do exactly what Marcelo ALONSO-ALMARAZ directed. W1 said she immediately reported her concerns to the Phoenix Police Department who eventually connected her with HSI.

31. I showed W1 several text messages SAs obtained from her cell phone during the hostage taking event that occurred in November 2022. W1 identified the specific messages between her, Guadalupe Davila-RAMIREZ, and Jose DAVILA where they instructed her to send

payments in exchange for having V1 and her kids smuggled into the United States. W1 identified the banking receipts and information that I previously obtained via during my investigation as accurate depictions of the accounts she deposited funds into. W1 also viewed a photograph SAs believed to be of Guadalupe. W1 positively identified the female in the photo as Guadalupe Davila-RAMIREZ.

32. SAs asked W1 if she tried to get in contact with Jose DAVILA once she believed V1 was in danger, W1 told SAs that Jose DAVILA stopped answering her calls once the male on the phone began to threaten the lives of V1 and her children.

33. During the smuggling events described above W1 was directed to deposit $5,000 in smugglers fees into the account of Karen Alexya PORTILLO, the SUBJECT ACCOUNT, by RAMIREZ. RAMIREZ provided W1 with Chase Bank account number 798217581 with routing number 111000614 matching the SUBJECT ACCOUNT. RAMIREZ then instructed W1 to deposit $5,000 into the account as part of the human smuggling conspiracy. Directly after this instruction RAMIREZ forwarded a Proof of Life video of V1, and MV1, and MV2.

34. Jose DAVILA also instructed W1 to deposit via Cashapp $5,000 into the SUBJECT ACCOUNT on October 30, 2022, and again on October 31, 2022. On November 1, 2022, W1 sent a photo of a Chase Bank cash deposit receipt for $5000 into the SUBJECT ACCOUNT to Jose DAVILA to confirm the human smuggling payment was made into the co-conspirator's account.

35. During my investigation I reviewed records from the SUBJECT ACCOUNT based upon the above messages. In reviewing the records, I confirmed that the SUBJECT ACCOUNT was opened on July 8, 2021, and in the name of Karen Alexya PORTILLO who is the sole account holder.

36.     Review of the account confirmed the $5,000 cash deposit into the account on November 1, 2022. Shortly after receiving the deposit into the SUBJECT ACCOUNT, PORTILLO sent a $1,000 Cashapp transfer to "Christian," followed by a $1,500 Remitly payment on November 6, 2022, and another $1,500 Remitly payment on November 8, 2022, accounting for $4,000 of the $5,000 total deposited. Remitly is an online money transfer service operating in the United States strictly designed and intended for the transfer of money from the United States to parties in Mexico. Therefore, it is evident that the illicit funds derived from an SUA were sent out of the United States to Mexico as part of the conspiracy in violation of 18 U.S.C. § 1956(a)(2).

37.     In my training and experience, I know that those involved in criminal conspiracies will often employ third parties to receive and transfer the illicit proceeds of their criminal activities in accounts often referred to as "funnel accounts", and that the third party will often retain a set agreed upon portion of the deposit as payment for their participation in the money laundering aspects of the conspiracy.

## CONCLUSION

38.     Based on the above facts and circumstances, I submit that this affidavit supports probable cause to believe that the SUBJECT PROPERTY represents proceeds of harboring and smuggling aliens as well as property involved in domestic and international money laundering and proceeds of money laundering. As such, the SUBJECT PROPERTY is subject to seizure and forfeiture to the United States Government pursuant to Rule 41 of the Federal Rules of Criminal Procedure, Title 18 United States Code sections 981 and 982, and Title 21 United States Code sections 853. I therefore respectfully request that this Court issue a Seizure Warrant authorizing the seizure of the SUBJECT PROPERTY.

39. I further request that the Seizure Warrant direct Chase Bank, at which the above account is maintained, to do the following:

- freeze the contents of the account in place and to refuse the withdrawal of any amount from the account by anyone other than HSI Special Agents for a period of up to fourteen days after service, and

- while any contents of the account are frozen in place to accrue deposits, interest and dividends, until HSI directs the contents of the account be liquidated. Freezing the contents could occur in the event the bank is unable to provide the funds immediately to HSI and therefore restricts the removal and/or dissipation of the funds by the account holders.

40. I swear this information is true and correct to the best of my knowledge.

41. This affidavit was approved by AUSA Letitia Simms.


Respectfully submitted,

_____
Kevin Rinehart
Special Agent
Homeland Security Investigations


Subscribed and sworn to before me telephonically, on October 17, 2023.

_____
KAREN B. MOLZEN
UNITED STATES MAGISTRATE JUDGE

**Attachment A**

Special Agents of Homeland Security Investigations (HSI) are authorized to effect the seizure of the accounts described in this warrant or, in the event the institution is unable to provide the funds immediately to HSI, to direct the financial institution at which the accounts are established to freeze the contents of the accounts in place and to refuse the withdrawal of any amount from the accounts by anyone other than HSI, for a period of up to fourteen days after service. While any contents of the accounts are frozen in place, the accounts shall continue to accrue deposits, interest, and dividends, until HSI directs that the contents of the accounts be finally liquidated and no contents remain, provided that this occurs within fourteen days of service.

